UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Berthel Fisher & Company
Financial Services, Inc., et al.,

    Plaintiffs,

 v.

Craig Larmon et al.,

    Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 11-889 ADM/JSM

___

Vincent Louwagie, Esq., and Courtland Merrill, Esq., Anthony, Ostlund, Baer & Louwagie, PA, Minneapolis, MN, and Stephen Holtman, Esq. and Paul Gamez, Esq., Simmons Perrine Moyer Bergman, Cedar Rapids, IA, on behalf of Plaintiffs.

Amie Penny, Esq., Margaret Goetze, Esq., and Frank Taylor, Esq., Briggs & Morgan, Minneapolis, MN, on behalf of Defendants.

___

# I. INTRODUCTION

On June 7, 2011, the undersigned United States District Judge heard oral argument on Plaintiffs' Motion for a Preliminary Injunction [Docket No. 5] and Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and to Compel Arbitration [Docket No. 8]. After the hearing, the parties submitted supplemental briefs which have also been considered. To accommodate scheduling concerns, on July 26, 2011, the Court entered an Order ruling on the parties' motions, ordering appropriate relief, and promising a Memorandum Opinion and Order would issue setting forth the reasoning for the Court's decision [Docket No. 42]. For the following reasons, Plaintiffs' Motion is granted and Defendants' Motion is denied.

## II.  BACKGROUND

A group of Minnesota limited liability companies under common ownership (referred to collectively as "Geneva") owned two Minnesota commercial properties at issue here:  One Southwest Crossing, an office building in Eden Prairie, Minnesota, and the Bloomington Corporate Center in Bloomington, Minnesota.  Geneva decided to offer "sophisticated, qualified and accredited[1] high net-worth investors" the opportunity to purchase shares of an undivided interest as tenants in common ("TIC") in each property.  Compl. [Docket No. 1] ¶ 27.  Because TIC investments are designed to qualify as like-kind exchanges under Section 1031 of the Internal Revenue Code, they allow an investor to defer capital gains tax by rolling the proceeds of the sale of one property directly into the purchase of another property.  Smith Decl. [Docket No. 15] ¶¶ 4-6.  Also, because TIC investments are securities, they may be offered for sale only through a licensed broker-dealer, with the terms of the offering described in a private placement memorandum.  Smith Decl. ¶¶ 7-8.

Geneva was not a licensed broker-dealer and could not sell the TIC investments directly to investors.  Accordingly, it sought the assistance of Berthel Fisher & Company Financial Services, Inc. ("Berthel"), a licensed securities broker-dealer and a member of the Financial Industry Regulatory Authority ("FINRA").[2]   Berthel agreed to act as managing broker-dealer, giving it the authority to offer the TIC investments directly to investors, and also to enlist

---

[1] In this context, investors are "accredited" under Rule 501(a) of Regulation D promulgated under the Securities Act of 1933.  Smith Decl. [Docket No. 15] Ex. E at 2; 17 C.F.R. § 230.501(a)(1).

[2] FINRA is the primary regulator of broker-dealers in the United States.  Prior to July 2007, FINRA was known as the National Association of Securities Dealers ("NASD").

additional FINRA broker-dealers to do the same. Smith Decl. ¶¶ 15, 18; Goetze Aff. [Docket No. 17] Ex. O ¶ 4.1.

As contemplated in its agreement with Geneva, Berthel recruited additional broker-dealers to offer the securities to investors, including OMNI Brokerage, Inc. ("OMNI"), Ameriprise Financial Services, LLC ("Ameriprise"), Welton Street Investments, LLC ("Welton Street"), and Securities America, Inc. ("Securities America") (collectively, "Selling Group Members" or "SGMs").[3] Each SGM acknowledged it was acting independently, and not as Berthel's agent; the SGMs further agreed that they would perform their own due diligence to determine the accuracy of the statements in the private placement memoranda. See Smith Decl. Exs. H, I, J, K. Berthel did not supervise the SGMs or the SGMs' registered representatives. Smith Supp. Decl. [Docket No. 24] ¶¶ 21-28.

Meanwhile, the private placement memoranda were being drafted by Geneva. One memorandum was drafted for each property describing the investment. Smith Decl. Exs. E, F, G. Berthel reviewed the memoranda for One Southwest Crossing and Bloomington Corporate Center and suggested changes, which Geneva adopted. Penny Supp. Aff. [Docket No. 38] Ex. E, F, G; Murphy Supp. Decl. [Docket No. 41] Ex. X. The first page of the finished memoranda for One Southwest Crossing and Bloomington Corporate Center identified Geneva at the top as the offering sponsor, and listed Berthel's name at the bottom. Smith Decl. Exs. E, F.

---

[3] The Court uses "Selling Group Members," the term used in the contracts between Berthel and the SGMs. In their memoranda, Plaintiffs refer to these entities as independent FINRA members or "IFMs," while Defendants refer to them as "sub-agents" of Berthel.

In 2007 and 2008, the securities were offered to investors by Berthel and the SGMs; Geneva retained the sole right to accept or reject investor subscriptions.[4]  Smith Decl. ¶¶ 18, 19 and Ex. E at 33, Ex. H ¶ 2(f); Goetze Aff. Ex. O ¶ 1.2.  The contracts between Berthel and the SGMs provided that Berthel would collect the Investors' payments and pass them along to Geneva, after first subtracting funds from which it would compensate itself and the SGMs.  See, e.g., Smith Decl. Ex. H ¶ 2(k).  This arrangement was also disclosed to investors in the private placement memoranda.  Smith Decl. Exs. E and F, at ii ¶ (2), 28, and 30-31.  Berthel and the SGMs were contractually required to determine that the investments were suitable for each investor, and to maintain files on each investor containing the documents underlying that determination.  See, e.g., Smith Decl. Ex. H ¶ 2(e); Goetze Aff. Ex. O ¶ 4.6.  The files included the signed purchase agreements for each transaction, which contained investors' names, dates of birth and contact information.  Smith Supp. Decl. Exs. P-T.

The TIC investments did not perform as anticipated.  Several investors ("Investors" or "Defendants")[5] who purchased the investments from the SGMs filed claims in two separate

---

[4] Craig Larmon, through OMNI, invested in One Southwest, an office building in Eden Prairie, Minnesota.  Earl Holasek, through Ameriprise, invested in One Southwest, Bloomington Corporate Center, and a third property in Texas known as The Falls.  Berthel did not serve as managing broker-dealer for The Falls, and its name did not appear as such in the private placement memorandum for that offering, but it was listed as managing broker-dealer in a Form D filing concerning the transaction.  See Smith Decl. ¶ 16, Ex. G; Goetze Aff. [Docket No. 17] ¶ 3, Ex. A.  The claimants in the Lane arbitration all invested in One Southwest, through SGMs Welton Street and Securities America.  Collectively, the Defendants purchased nearly $3.5 million of TIC investments in One Southwest, Bloomington Corporate Center, and the Falls.  Smith Decl. Ex. B, ¶ 7 (Larmon, $800,000), ¶ 11 (Holasek, $1,200,000), Ex. D. ¶ 1 (Lane, $465,000), ¶ 5 (Hoopes, $500,000), ¶ 7 (Jordan, $453,000).

[5] The word "Investors" is used here to include both the individual investors and, where applicable, the limited liability companies through which they purchased the TIC Investments.

arbitrations before FINRA, alleging the SGMs and Berthel failed to conduct due diligence that would have revealed Geneva's misstatements of fact in the private placement memoranda. Smith Decl. Exs. A-D. The merits of these claims are not before the Court.

Instead, before the Court is the question of whether the Investors' claims against Berthel and its employees (hereafter, "Berthel" or "Plaintiffs") are arbitrable.[6] Berthel has filed this action seeking a declaration that the Investors are not its customers, and seeking to enjoin certain Investors[7] from pursuing claims against it in arbitration. The Investors maintain they are customers, and cross move to compel arbitration.

### III. DISCUSSION

The Court must determine whether the parties have agreed to submit this dispute to arbitration. If so, the Federal Arbitration Act, directs the Court to compel arbitration and either dismiss or stay this action. 9 U.S.C. §§ 1- 16 ("FAA" or "Act"). If not, the Court may enjoin the arbitrations pursuant to Federal Rule of Civil Procedure 65.

**A.      Investors' Motion to Dismiss or to Compel Arbitration**

The FAA governs arbitration agreements relating to transactions involving interstate commerce. It provides that written agreements to arbitrate are "valid, irrevocable and

---

[6] The two arbitrations at issue in this matter were filed on June 17, 2010 by Craig Larmon (the "Larmon arbitration") and February 2011 (the "Lane arbitration"), respectively. Berthel initially consented to arbitrate the Larmon arbitration, which involved only One Southwest. However, on October 25, 2010, Larmon amended his claim to bring in claims by Earl Holasek and other investors about investments in One Southwest, Bloomington Corporate Center and The Falls, and also chose to name Berthel employees as additional respondents. At this point Berthel objected to arbitrability. Three additional arbitrations, not presently at issue, were subsequently filed by other investors in One Southwest. Defs.' Mem. Opp. [Docket No. 25] at 7.

[7] Berthel is not seeking to enjoin the arbitration of Larmon's claim, which it voluntarily agreed to arbitrate. Plaintiffs' Mem. Resp. [Docket No. 22] at 14 n.15.

enforceable" as any contract would be. 9 U.S.C. § 2. The Act reflects a "federal policy favoring arbitration," requiring that courts "rigorously enforce agreements to arbitrate." Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987) (internal quotations omitted). Such enforcement occurs by means of a motion to compel arbitration. 9 U.S.C. § 4. "A court's role under the FAA is therefore limited to determining (1) whether a valid agreement to arbitrate exists, and, if it does, (2) whether the agreement encompasses the dispute." Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 871 (8th Cir. 2004).

As an initial matter, the Investors argue Berthel has waived its right to have a court decide this issue by participating in the Larmon arbitration. The Court does not agree. "A dispute like the one here – over whether the parties agreed to arbitrate – will be resolved by the district court unless the parties clearly and unmistakably provide otherwise." Express Scripts, Inc. v. Aegon Direct Marketing Servs., Inc., 516 F.3d 695, 701 (8th Cir. 2008) (internal quotation omitted). While "doubts concerning the scope of the arbitrable issues should be resolved in favor of arbitration," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983), doubts about who decides the issue of arbitrability should be resolved in favor of the court. Express Scripts, 516 F.3d at 700.

Here, Berthel expressly agreed to submit Larmon's individual claim to arbitration, and is not contesting the arbitrability of that individual claim. But when the Larmon claim was amended, Berthel timely objected to the arbitrability of the additional claims. Mere participation in arbitration does not waive objections to arbitrability. See Marathon Ashland Petroleum v. Int'l Bhd. of Teamsters, 300 F.3d 945, 950 (8th Cir. 2002) (no waiver where plaintiff agreed to participate in selecting arbitration panel, while simultaneously objecting to arbitration and filing

suit). Berthel has participated in arbitration, has protected its interests by filing counterclaims, and initially raised its objections to arbitrability before FINRA before filing this lawsuit. The Court finds no evidence of "clear and unmistakable intent" on Berthel's part to submit the question of arbitrability to the arbitration panel. As long as objections are timely made, cooperating with arbitration procedure – especially where, as here, Berthel has agreed to arbitrate some of the claims – is not inconsistent with preserving the right to have the question of arbitrability heard and decided by a court.

Having found no waiver, the Court turns to the question of whether this dispute is arbitrable. There is no written arbitration agreement between the Investors and Berthel. However, Berthel has signed the FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA Code"), which serves as a valid agreement to arbitrate disputes with its customers. See, e.g., Washington Square Securities, Inc. v. Aune, 385 F.3d 432, 435 (4th Cir. 2004) (construing predecessor NASD Code); Multi-Financial Sec. Corp. v. King, 386 F.3d 1364, 1367 (11th Cir. 2004) (same); Vestax Securities Corp. v. McWood, 280 F.3d 1078, 1081 (6th Cir. 2002) (same); Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770, 771 (8th Cir. 2001) (same); O.N. Equity Sales Co. v. Prins, 519 F. Supp. 2d 1006, 1010 (D. Minn. 2007) (both NASD and FINRA). The issue is simply, if the Investors are Berthel's customers, then the dispute with Berthel is arbitrable.

The FINRA Code does not define "customer," stating only that a "customer shall not include a broker or dealer." FINRA Code, Rule 12100(i). The Eighth Circuit has construed the predecessor NASD rule to require that a "customer" is "one involved in a business relationship with an NASD member that is related directly to investment or brokerage services." Fleet

Boston, 264 F.3d at 772.  Thus there must exist "some brokerage or investment relationship" between the member and a customer.  Id.

Here, the Investors purchased the TIC investments through the SGMs, whom Berthel enlisted.  The question is whether, by opening accounts with the SGMs and dealing with the SGMs' registered representatives, the Investors also became customers of Berthel.[8]

It appears no court has yet considered the FINRA "customer" relationship in the precise configuration presented here.  To establish a "customer" relationship, therefore, the Investors rely on an analogous body of law arising out of investor dealings with a firm's "associated persons." The FINRA Code defines an "associated person" as a "natural person" who "is registered or has applied for registration" with FINRA, who is "[a] sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions," or "a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member." FINRA Code, Rule 12100(a), (r).  For example, a member firm's registered representative is an "associated person."  See, e.g., King, 386 F.3d at 1368.

A customer of a firm's "associated person" is considered to be a customer of the firm. See King, 386 F.3d at 1370; Vestax, 280 F.3d at 1082; Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 357 (2d Cir. 1995); Washington Square Securities, Inc. v. Sowers, 218 F. Supp. 2d 1108, 1117 (D. Minn. 2002); In re Zayed, Complaint No. 2006003834901, 2010 WL 3298899, *5 (FINRA Nat'l Adj. Council August 19, 2010) (unpublished).  The FINRA Code explicitly

---

[8] The Court assumes, without deciding, that an investor may be a "customer" of any number of FINRA members, provided the investor has the requisite "brokerage or investment relationship" with each firm.

requires members to arbitrate disputes with investors who do business with the firms' associated persons. See FINRA Rule 12200. This obligation is broad, and requires a firm to arbitrate claims by "investors who believed they were dealing with the member through an associated person," Aune, 385 F.3d at 436, even if the member firm has no contact whatsoever with the investors and no knowledge of the dealings that give rise to the claims. See John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 51 (2d Cir. 2001); MONY Securities Corp. v. Bornstein, 390 F.3d 1340, 1344 (11th Cir. 2004).

If investors deal with someone who is not a firm's "associated person," the result changes. For example, investors may give funds to an individual who invests through a FINRA member firm, but is not "associated" with the firm. In such a case, the investors are doing business with a customer of the firm, rather than with a firm's "associated person." In such cases courts consistently hold that doing business with a member firm's customer is not equivalent to doing business with the firm itself. See, e.g., Bensadoun v. Jobe-Riat, 316 F.3d 171, 177 (2d Cir. 2003); Herbert J. Sims & Co. v. Roven, 548 F. Supp. 2d 759, 765-66 (N.D. Cal. 2008) ("Sims"); Janney Montgomery Scott LLC v. Greenberg, Civ. No. 10-4248, 2010 WL 2835562, *2 (S.D.N.Y. July 1, 2010) (unpublished) ("JMS"); Charles Schwab & Co. v. Reaves, Civ. No. 09-2590, 2010 WL 447370, *5 (D. Ariz. Feb. 4, 2010) (unpublished) ("Schwab"); see also RBC Capital Markets Corp. v. Thomas Weisel Partners LLC, Civ. Nos. 4709, 4760, 2010 Del. Ch. LEXIS 36, *33-36 (Del. Ch. February 25, 2010) (unpublished) ("RBC"); Interactive Brokers, LLC v. Michael Duran, Civ. No. 08-6813, 2009 U.S. Dist. LEXIS 11552, *10-11 (N.D. Ill. February 17, 2009) (unpublished) ("Interactive Brokers"); Brookstreet Securities Corp. v. Bristol

Air, Inc., Civ. No. 02-0863, 2002 U.S. Dist. LEXIS 16784, *23-27 (N.D. Cal. August 5, 2002) (unpublished) ("Brookstreet"). Berthel argues these cases provide a better analogy.

In one case, investors pooled their money and gave it to an individual who was not affiliated with any member firm. That individual invested the funds with an associated person of a member firm. Bensadoun, 316 F.3d at 173. The Second Circuit found a question of fact as to whether a customer relationship existed between the investors and the member firm. If the person associated with the member firm "was complicit in a fraudulent scheme that involved misleading the [i]nvestors into believing that they were customers of his and [the firm's]," then a customer relationship existed between the firm and the investors. Id. at 177. But if not, then it did not. "Otherwise, every purchaser of shares in a mutual fund and every beneficiary of a pension fund would arguably be 'customers' of every investment institution with which those funds did business, and would be entitled to demand arbitration under the NASD." Id. Similarly, those who invest with an individual who has an account at a brokerage firm, do not thereby become customers of the brokerage firm. See Brookstreet, 2002 U.S. Dist. LEXIS at *23-25; JMS, 2010 WL 2835562, *2; Schwab, 2010 WL 447370, *5. See also Sims, 548 F. Supp. 2d at 765 (holding those who have accounts at one firm, and invest in securities offering underwritten by second firm, do not thereby become customers of second firm).

The distinction between doing business with a firm's associated person, and doing business with a firm's customer, may be illustrated by observing how courts treat arbitrations arising out of investment fraud. In the case of fraud, the firm may have no contact whatsoever with the investors and no awareness of the activities leading to their claims. If the individual committing the fraud is associated with the member firm, the firm has a duty to supervise, and

must arbitrate claims arising out of the associated person's alleged misconduct. See, e.g., John Hancock, 254 F.3d at 59-60; Bensadoun, 316 F.3d at 177-78. But if the perpetrator is merely a customer or client of the firm, the firm has no duty to supervise, and no obligation to arbitrate. See, e.g., Schwab, 2010 WL 447370, *5-6 (individual who had account at member firm perpetrated a Ponzi scheme; victimized investors were not clients of the firm). The courts have held such downstream investors cannot avail themselves of the member's agreement to arbitrate customer disputes. See, e.g., Sims, 548 F. Supp. 2d at 765-66; JMS, 2010 WL 2835562 at *2; Schwab, 2010 WL 447370 at *5.

The Court finds these cases instructive in resolving the present case. If the Investors had dealt directly with Berthel or with one of Berthel's "associated persons," they could arbitrate their claims against Berthel.[9] They did not. Instead, they dealt with the SGMs, independent broker-dealers recruited by Berthel to offer the investments. The Investors can arbitrate their claims against the SGMs, with whom they dealt directly; but they cannot fold into the arbitrations claims against other entities with whom they have no direct relationship. To expand the definition of "customer" to include individuals with no direct business or investment relationship with a firm, as the Investors here seek to do, would frustrate the reasonable expectations of FINRA members. Fleet Boston, 264 F.3d at 772; Wheat, First Securities, Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993) ("We cannot imagine that any NASD member would have contemplated that its NASD membership alone would require it to arbitrate claims which

---

[9] Indeed, Berthel concedes that certain claimants, such as Stephen Badeau in the Larmon arbitration and Jane Bowman in the Lane arbitration, did deal directly with Berthel and are therefore its customers. Berthel does not contest the arbitrability of their claims.

arose while a claimant was a customer of another member merely because the claimant subsequently became its customer.").

The Investors suggest the SGMs should be treated as the functional equivalent of "associated persons." The Court declines to do so. The FINRA Code explicitly states that "associated persons" must be natural persons, not firms. FINRA Code, Rule 12100(r). A member firm would therefore reasonably expect to arbitrate claims arising out of the actions of the natural persons with whom it chooses to affiliate, but not claims arising out of the actions of other broker-dealers with whom it does business. The SGMs are broker-dealers contractually bound to do their own due diligence; Berthel has no obligation to supervise them and no reason to expect it will be obliged to arbitrate disputes arising out of their conduct. The SGMs through whom the Investors purchased the securities are not the equivalent of Berthel's "associated persons." Therefore the Defendants are not customers of Berthel, nor customers of Berthel's employees, and cannot compel Berthel to arbitrate disputes.

The Investors next argue that a customer relationship is established because (1) Berthel maintained files on the TIC transactions which included their personal information; (2) Berthel was compensated for its activities as managing broker-dealer; (3) the private placement memoranda identified Berthel as managing broker-dealer; (4) Berthel suggested changes to the memoranda, which Geneva ultimately adopted; and (5) Geneva faxed the Investors' purchase agreements and trust documents to Berthel. See Smith Supp. Decl. Ex. Q, R, S. These facts, taken alone or together, are insufficient to establish a "brokerage or investment relationship" as required by Fleet Boston.

In <u>Fleet Boston</u>, a NASD brokerage firm offered "financial advice and assistance" to a client company in anticipation of a merger. <u>Fleet Boston</u>, 264 F.3d at 771. The client company declined to pay over $800,000 in fees and expenses, and the brokerage firm sued for breach of contract. In response, the client company sought arbitration. Although the parties had a direct contractual relationship and a substantial amount of compensation was at issue, the Eighth Circuit declined to find a customer relationship in the absence of "some brokerage or investment relationship between the parties." <u>Id.</u> at 772. The court stated, "We do not believe the NASD Rules require a member to submit to arbitration in every dispute that involves its business activities with a non-member." <u>Id.</u> at 773.

Here, although the overall business arrangement does concern the issuance of securities, the relationship between Berthel and the Investors is even more tenuous. There is no contract or direct brokerage or investment relationship between Berthel and the Investors. The Investors did not entrust their money to Berthel to manage. Berthel did not sponsor the securities purchased by the Investors. Instead, Berthel served as managing broker-dealer. It enlisted and paid other broker-dealers; it maintained business records about the determination of investor suitability; its name and role appeared in offering documents; it suggested edits to offering documents; and for these efforts it was compensated.

Participating in a securities transaction, maintaining files on that transaction which may contain investors' personal identifying information, and being compensated for services rendered to a third party, do not amount to providing "brokerage or investment services" to every investor who purchases the securities. Neither does being identified in, or suggesting changes to, a private placement memorandum. Of course private placement memoranda must be expected to

ultimately be circulated to investors; that is their purpose. But the mere circulation of a private placement memorandum which identifies the participants in a transaction does not establish a customer relationship between sufficient to invoke FINRA arbitration.

If the Court were to find a "brokerage or investment relationship" here, then, as the Second Circuit observed, "every purchaser of shares in a mutual fund and every beneficiary of a pension fund would arguably be 'customers' of every investment institution with which those funds did business, and would be entitled to demand arbitration." Bensadoun, 316 F.3d at 177. Berthel has no customer relationship with any of the named Defendants in this action, and Berthel is entitled to a declaration to that effect.

**B.      Preliminary Injunction**

The next question is whether the Defendants should be enjoined from pursuing their claims against Berthel in arbitration.[10] On a motion for preliminary injunctive relief the Court considers four factors: (1) the threat of irreparable injury to the plaintiff; (2) the balance of harm to the plaintiff if relief is not granted and harm to the defendant if an injunction is issued; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981); Fed. R. Civ. P. 65(a). The grant or denial of an injunction is a matter of discretion. Dataphase, 640 F.2d at 114 n.8.

Berthel has shown irreparable harm. A party suffers irreparable harm when it is forced to arbitrate a dispute it did not agree to arbitrate. See McLaughlin Gormley King Co. v. Terminix Int'l Co., 105 F.3d 1192, 1194 (8th Cir. 1997). This factor favors granting the injunction.

---

[10] Berthel does not seek to enjoin the Investors' arbitrations against the SGMs, nor the arbitrations of its own customers, Steven Badeau and Janet Bowman. Nor does it seek to enjoin the arbitration of Craig Larmon, to which it has separately consented.

The balance of the harms also favors granting the injunction. The Court is mindful that one Investor, Earl Holasek, has been diagnosed with mesothelioma, and any delay of the Larmon arbitration may work a hardship on him. However, no delay is required; Holasek may pursue his claims against the SGMs immediately. The only harm to Holasek and the other Investors is that they cannot also have their claims against Berthel resolved in arbitration, because Berthel has not agreed to do so. The balance of the harms favors granting the injunction.

In deciding the Investors' motion to compel, the Court has concluded that the Investors are not "customers" within the meaning of the FINRA Code. A declaration to that effect is the primary relief sought by Berthel. Accordingly, Berthel has succeeded on the merits. This factor favors granting the injunction.

Finally, the Court considers the public interest. Public policy favors arbitration, Moses H. Cone Mem'l Hosp., 460 U.S. at 24, especially in the securities context, but only where the parties have agreed to submit their disputes to arbitration. See AT&T Tech., Inc. v. Comm. Workers of Am., 475 U.S. 643, 648 (1986). Public confidence in arbitration would be undermined if a party could be compelled to arbitrate without its consent. At the same time, the public interest demands that those who believe they are wronged by another's conduct have recourse to a forum where they can have their claims heard. That interest is satisfied: the Investors retain their right to have their claims against Berthel adjudicated in court, should they choose to do so.

The Court finds the Dataphase factors favor granting the injunction.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion [Docket No. 5] is **GRANTED** and Defendants' Motion [Docket No. 8] is **DENIED**. Each party shall bear its own attorney fees and costs.

IT IS FURTHER ORDERED that:

1. Defendants are not "customers" of Plaintiffs within the meaning of the FINRA Code of Arbitration Procedure for Customer Disputes, have no standing under the FINRA Rules to compel arbitration, and no applicable precedent requires Plaintiffs to arbitrate Defendants' claims.

2. All Defendants other than Craig Larmon and Geneva OSWX XXII, LLC shall be immediately restrained and enjoined from pursuing their claims against Plaintiffs in the Larmon and Lane Arbitrations.

LET JUDGMENT BE ENTERED ACCORDINGLY.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: August 1, 2011.